**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION - CINCINNATI**

| | | |
|---|---|---|
| BRUCE ERIKSON, | : | Case No. 1:23-cv-66 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| XAVIER UNIVERSITY, et al., | : | |
| Defendants. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendant Kelly Phelps's Motion for Summary Judgment (Doc. 63), Plaintiff Bruce Erikson's Motion for Partial Summary Judgment (Doc. 64), Defendant Eva Marie Witt's Motion for Summary Judgment (Doc. 65), and Defendant Xavier University's Motion for Summary Judgment (Doc. 67). Each motion has been fully briefed. (*See* Docs. 75, 77, 79, 81, 83, 85-87.) Thus, these matters are ripe for the Court's review.

For the reasons below, Defendant Kelly Phelps's Motion for Summary Judgment (Doc. 63) is **DENIED**, Plaintiff Bruce Erikson's Motion for Partial Summary Judgment (Doc. 64) is **DENIED**, Defendant Eva Marie Witt's Motion for Summary Judgment (Doc. 65) is **GRANTED**, and Defendant Xavier University's Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART AND DENIED IN PART**.

## FACTS

Plaintiff Bruce Erikson began teaching in Defendant Xavier University's Art Department in 2006. (Erikson Dep., Doc. 49-1, Pg. ID 1381.) In 2012, Xavier promoted Erikson to associate professor with tenure. (*Id.* at Pg. ID 1382.)

### I. Erikson's Employment Terms and University Policies

According to the June 10, 2022 Salary Letter ("Salary Letter") issued to Erikson by Xavier, Erikson's appointment to associate professor was "subject to the terms and conditions specified in the Faculty Handbook." (Salary Letter, Doc. 49-1, Pg. ID 1615.) Xavier later increased Erikson's salary on August 15, 2022, though the letter informing Erikson of this fact ("Increase-in-Salary Letter") did not describe any other aspects of his employment. (Increase-in-Salary Letter, Doc. 49-1, Pg. ID 1616.)

Xavier's Faculty Handbook identifies policies relating to faculty designation, the procedure for promotions and terminations, and a brief discussion of benefits. (*See* Faculty Handbook, Doc. 43-1, Pg. ID 404-39.) The Faculty Handbook also references policies that are not specifically defined in the Faculty Handbook. For example, a tenured professor's employment can only be terminated for "grave cause." (*Id.* at Pg. ID 433.) "Grave cause" includes "grave violations of University policies, such as those governing sexual harassment." (*Id.*) The Faculty Handbook does not define what that sexual harassment policy is. (*See id.*)

To be sure, while Xavier's Harassment Code and Accountability Procedure ("HCAP") is not explicitly referenced in either the Salary Letter or the Faculty Handbook, Erikson was required to follow that policy as a requirement for continued employment.

(*See* June 10, 2022 Salary Letter, Doc. 49-1, Pg. ID 1615; Faculty Handbook, Doc. 43-1, Pg. ID 404-39; Erikson Dep., Doc. 49-1, Pg. ID 1394-95; Lawson Dep., Doc. 43-1, Pg. ID 659; Hanycz Dep., Doc. 47-1, Pg. ID 1181.)

## II. Complaints against Erikson

During Erikson's tenure, Xavier faculty received complaints from students about Erikson's behavior toward them. (*See, e.g.*, Choteau Dep., Doc. 53-1, Pg. ID 1893-94, 1896.) For example, Defendant Kelly Phelps, a Xavier art professor, testified that he received frequent complaints from students that Erikson acted inappropriately in "a creepy way," such as showing favoritism and inviting students to his home. (Phelps Dep., Doc. 52-1, Pg. ID 1849.) When he received these complaints, Phelps directed these students to Xavier's formal reporting mechanisms to report these incidents. (*Id.* at Pg. ID 2000.)

## III. The Incident

Defendant Eva Marie Witt was a student of Erikson's at Xavier before graduating in 2013. (Witt Dep., Doc. 46-1, Pg. ID 1016; Erikson Dep., Doc. 49-1, Pg. ID 1514-15.) After graduating, Witt lived in Chicago until the fall of 2019, when Witt returned home to the Cincinnati area. (Witt Dep., Doc. 46-1, Pg. ID 1027-28, 1036.) Upon Witt's return, Witt contacted Erikson to ask him to serve as a reference for a job. (Erikson Dep., Doc. 49-1, Pg. ID 1517.)

Over the following months, Erikson and Witt began spending time together, including at Erikson's home, where they worked on art. (Erikson Dep., Doc. 49-1, Pg. ID 1518-19; Witt Dep., Doc. 46-1, Pg. ID 1048.) On December 31, 2019, Witt again went to Erikson's residence, where the two worked on art and had dinner. (Erikson Dep., Doc.

49-1, Pg. ID 1520; Witt Dep., Doc. 46-1, Pg. ID 1057.) Over the course of the night, Witt and Erikson consumed about two bottles of wine. (Erikson Dep., Doc. 49-1, Pg. ID 1521; Witt Dep., Doc. 46-1, Pg. ID 1041-53.) The two engaged in sexual intercourse that night and the morning of January 1, 2020. (Erikson Dep., Doc. 49-1, Pg. ID 1522-34; Witt Dep., Doc. 46-1, Pg. ID 990.)

The parties dispute whether that intercourse was consensual. Erikson testified that Witt consented both verbally and through Witt's conduct. (Erikson Dep., Doc. 49-1, Pg. ID 1522-34.) Witt, by contrast, testified to never giving full consent to any sexual contact with Erikson that night, and that the alcohol consumption left Witt without the capacity to do so. (Witt Dep., Doc. 46-1, Pg. ID 1050-72.)

## IV. Witt's Conversation with Phelps

On February 5, 2022, Witt told Phelps via text message that Erikson had raped Witt on the night of December 31, 2019, and the morning of January 1, 2020. (*See* Phelps Text Messages, Doc. 52-1, Pg. ID 1872-84.) Witt confided in Phelps because he was a "consistent supportive mentor." (Witt Dep., Doc. 46-1, Pg. ID 1014.)

In the text exchange, Witt told Phelps that Witt believed Erikson "groomed [Witt] and raped [Witt]." (Phelps Text Messages, Doc. 52-1, Pg. ID 1875.) Later in the exchange, Phelps stated, "I knew he ha[d] preyed on young women all along." (Compl., Doc. 1, ¶ 14; Phelps Answer, Doc. 4, ¶ 14.) When Witt inquired what Phelps meant, he responded that "[n]ot this situation but others have come out and said similar things." (Phelps Text Messages, Doc. 52-1, Pg. ID 1878.) Phelps encouraged Witt to report the incident, stating that "[y]ou could help future young ladies not have to go through this." (*Id.* at Pg. ID

1879.) Phelps later provided Witt with the resources that Witt could use to report the incident to Xavier. (Witt Dep., Doc. 46-1, Pg. ID 1019.)

## V. Witt's Complaint to Xavier

Witt eventually spoke with Xavier's Title IX & Interpersonal Violence Response Coordinator, Kate Lawson, about the incident. (Witt Dep., Doc. 46-1, Pg. ID 1023; Lawson Dep., Doc. 43-1, Pg. ID 714-15; Xavier Interrogatory Responses, Doc. 43-1, Pg. ID 579.) The initiation and handling of Witt's complaint was governed by several key provisions of the HCAP.

### a. Applicability

First, Section 1.2 of the HCAP explains that the HCAP applies to the "'University Community' which includes all persons who are enrolled at or employed by Xavier University while they are on campus or are participating in a University-related off-campus activity." (HCAP, Doc. 1-4, Pg. ID 50.) The HCAP further "applies when an employee . . . is accused of violating Xavier's harassment policies by a student, employee, contracted employee, or third party (i.e. visitor to campus.)." (*Id.* at Pg. ID 51.) Section 2.1 also states that "Xavier community members and third parties who have experienced or are experiencing harassment by a Xavier employee are encouraged to bring them to the attention of" Xavier. (*Id.* at Pg. ID 52.)

Section 4.2.2 of the HCAP defines Interpersonal Violence broadly as certain unwelcome, intimate acts "perpetrated by any person against another." (HCAP, Doc. 1-4, Pg. ID 69.) Interpersonal Violence is "not within the confines of Title IX Sexual Harassment, such as, but not limited to, conduct of a student that occurs off-campus."

(*Id.*) Although Xavier has applied the HCAP to third parties, the record is unclear whether those past incidents occurred on or off campus. (*See* Lawson Dep., Doc. 43-1, Pg. ID 655-56; Cull Dep., Doc. 45-1, Pg. ID 946-47; Hanycz Dep., Doc. 47-1, Pg. ID 1186.) Nevertheless, Lawson determined that the HCAP applied to Witt's complaint, even though Witt was not a student at the time of the incident and the conduct occurred off campus. (*See, e.g.*, Interpersonal Violence Investigation Report, Doc. 43-1, Pg. ID 565-66.)

**b. Deadlines to File**

HCAP formal complaints generally must be filed within two years of the alleged conduct, though the policy allows the Affirmative Action Officer to grant "a reasonable extension." (HCAP, Doc. 1-4, Pg. ID 112.) The purpose of this time limit is to "encourage Complainants to come forward as soon as possible . . . and to protect responding parties against complaints that are too old to be effectively investigated," as "delay may make addressing the harassment difficult as witnesses may no longer be able to recall events" or corroborate evidence. (*Id.* at Pg. ID 112-13.)

Witt's complaint was submitted about five weeks after that two-year deadline. (Lawson Dep., Doc. 43-1, Pg. ID 719.) According to Lawson, no rape allegation against a sitting faculty member had previously fallen outside HCAP's two-year filing window. (*Id.* at Pg. ID 914.) Nevertheless, Lawson asked Affirmative Action Officer Jenni Dramis to grant an extension to the HCAP's filing deadline, citing the severity of the allegation and the brief delay. (*Id.* at Pg. ID 719, 764.) Dramis granted it. (*See id.*)

**c. Formality**

Lastly, the HCAP states that "[a]lthough a complaint that is filed after the two year

time period cannot be pursued under the formal procedures, informal procedures may be used at any time." (HCAP, Doc. 1-4, Pg. ID 113.) Section 5.8 of HCAP explains that the "HCAP favors informal resolution of harassment claims," though the "exception to this preference is in matters involving allegations of Title IX Sexual Harassment made by a student or allegations of Rape, Sexual Assault, or Sexual Imposition made by any individual." (*Id.* at Pg. ID 114.) Given the extension and surrounding circumstances of Witt's complaint, Xavier proceeded with the complaint through HCAP's formal procedure. (*See, e.g.*, Interpersonal Violence Investigation Report, Doc. 43-1, Pg. ID 565-66.)

**VI. Lawson's Investigation**

On February 24, 2022, Lawson notified Erikson that Witt had filed a formal complaint against him, alleging that he violated HCAP's Interpersonal Violence provision. (Notice of Formal Complaint, Doc. 43-1, Pg. ID 602-03.) The notice advised Erikson of his right to an advisor, his right to review the evidence, and the preponderance-of-the-evidence standard that would apply. (*See id.*)

Lawson proceeded to investigate Witt's complaint. This investigation included interviews with both parties and relevant witnesses, as well as the collection of supporting documentation. (*See, e.g.*, Interpersonal Violence Investigation Report, Doc. 43-1, Pg. ID 565-66; Lawson Dep., Doc. 43-1, Pg. ID 725, 735, 748.) Lawson shared her findings with both Witt and Erikson. (Lawson Dep., Doc. 43-1, Pg. ID 735.) Based on her findings, Lawson determined that there was reasonable cause to believe a violation of HCAP's Interpersonal Violence policy may have occurred, and that the matter should

proceed to a hearing. (Interpersonal Violence Investigation Report, Doc. 43-1, Pg. ID 565-66.)

## VII. HCAP Hearing and Results

Xavier held an HCAP hearing related to Witt's complaint on July 22 and 25, 2022. (Hearing Results Email, Doc. 49-1, Pg. ID 1653.) During the hearing, Erikson was represented by counsel, made an opening statement, called witnesses, presented evidence, and cross-examined Witt and Witt's witnesses. (Erikson Dep., Doc. 49-1, Pg. ID 1465-68.) Throughout the hearing, panel members made efforts to use Witt's preferred pronouns. (*See, e.g.*, Erikson Dep., Doc. 49-1, Pg. ID 1460, 1471-74.)

On July 27, 2022, Xavier informed the parties that the HCAP hearing panel had found, by a preponderance of the evidence, that Erikson had violated HCAP's Interpersonal Violence policy. (Hearing Results Email, Doc. 49-1, Pg. ID 1653-54.) The panel's findings rested on evidence of coercion, an imbalance of power, and the fact that Erikson and Witt had consumed approximately two bottles of wine the evening of the incident—factors the panel determined removed Witt's ability to consent. (*See id.*) Dramis opined that the "imbalance of power" finding likely related to the fact that Erikson was "older and a male." (Dramis Dep., Doc. 44-1, Pg. ID 815, 867.) But, Dramis acknowledged that she had no role in deciding whether Erikson violated Xavier policy. (*Id.* at Pg. ID 823-24.)

Erikson appealed. (Appeal Notice, Doc. 60-1, Pg. ID 2554-60.) Xavier President Colleen Hanycz reviewed the appeal, issuing a written decision upholding the panel's finding on October 5, 2022. (Appeal Decision, Doc. 47-1, Pg. ID 1305-17.)

## VIII. Erikson's Termination

Because Erikson held tenure, a separate body, the Faculty Hearing Committee, was required to determine whether the HCAP finding constituted "grave cause" to warrant termination under the Faculty Handbook. (Faculty Handbook, Doc. 43-1, Pg. ID 433.) The Faculty Hearing Committee found that the HCAP finding constituted grave cause and recommended the termination of Erikson. (Chrastil Dep., Doc. 48-1, Pg. ID 1336.) On October 2, 2022, Xavier notified Erikson that President Hanycz had upheld the HCAP finding, accepted the Faculty Hearing Committee's grave-cause recommendation, and terminated his tenure and employment effective October 7, 2022. (Termination Letter, Doc. 48-1, Pg. ID 1357.)

## PROCEDURAL POSTURE

On February 2, 2023, Erikson filed this action against Xavier, Witt, and Phelps. (Compl., Doc. 1.) Against Witt and Phelps, Erikson asserts claims for defamation. (*Id.* at ¶¶ 24-29.) Against Xavier, Erikson asserts claims for breach of contract, gender discrimination under Title IX and Title VII, and public disclosure of private facts. (*Id.* at ¶¶ 30-42.) Defendants now move for summary judgment on all the claims against them, and Erikson moves for summary judgment on his breach of contract claim against Xavier. (Motions for Summary Judgment, Docs. 63-65, 67.)

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no

genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). And, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As noted above, Erikson brings defamation claims against both Witt and Phelps, as well as claims against Xavier for breach of contract, Title IX and Title VII gender discrimination, and public disclosure of private facts. (Compl., Doc. 1, ¶¶ 24-42.) The Court will first consider Erikson's defamation claims against Phelps and Witt, before turning to his claims against Xavier.

### I. Defamation Claim Against Phelps

The Court begins with the defamation claim directed at Phelps. (*See* Compl., Doc.

1, ¶¶ 27-29.) "[D]efamation occurs when a publication contains a false statement made with some degree of fault, reflecting injuriously on a person's reputation, or . . . affecting a person adversely in his or her trade, business or profession." *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012) (quotation omitted). "To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Id.*

Erikson's defamation claim against Phelps centers on Phelps's text messages to Witt, wherein Phelps states that he knew that Erikson had "preyed on young women all along" and, when asked for clarification, that "[n]ot this situation but others have come out and said similar things." (Compl., Doc. 1, ¶ 14; Phelps Answer, Doc. 4, ¶ 14.) Phelps argues that he is entitled to summary judgment on this claim because these statements were true and otherwise protected as opinion and by qualified privilege. (*See* Phelps Motion, Doc. 63.) The Court will consider each argument in turn.

**a. Truthfulness**

Phelps first argues that he is entitled to summary judgment in his favor because his statements were truthful, as students had, over the years, brought him complaints that Erikson had been grooming them. (Phelps Motion, Doc. 63, Pg. ID 2580-81.)

Falsity is an essential element of a defamation claim. *Am. Chem. Soc.*, 978 N.E.2d at 852. "A statement is not a false statement if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it." *Anthony List v. Driehaus*,

779 F.3d 628, 633 (6th Cir. 2015) (applying Ohio law). "It is sufficient [in defending a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Nat'l Medic Serv. Corp. v. E.W. Scripps Co.*, 573 N.E.2d 1148, 1150 (Ohio 1989) (quotation omitted).

Phelps's statements are capable of two readings, and the truth of each must be assessed separately. Read broadly, Phelps's statement that he "knew [Erikson] had preyed on young women all along," combined with his follow-up that "others have come out and said similar things," could be understood to mean that other women had accused Erikson of rape or assault comparable to what Witt described. Under the broad reading, the record does not support Phelps's truth defense. Phelps identifies no student, no complaint, and no formal report accusing Erikson of rape or assault before Witt came forward. At most, the students who spoke to Phelps described Erikson's conduct as inappropriate or uncomfortable. (*See* Phelps Dep., Doc. 52-1, Pg. ID 1849.)

Read more narrowly, as Phelps himself now characterizes it in his motion, the statement could also be meant to convey only that Erikson had a pattern of grooming behavior. Even under the narrower reading, the truth defense does not resolve cleanly in Phelps's favor. Characterizing Erikson's conduct as "grooming" is itself a significant characterization, and it is a substantial step beyond the complaints Phelps testified to receiving. Phelps received complaints from students who described feeling uncomfortable around Erikson because of favoritism or attention, not students who described a deliberate pattern of grooming. (*See* Phelps Dep., Doc. 52-1, Pg. ID 1849.) While favoritism and discomfort could suggest grooming, they are also consistent with

far less serious misconduct, and Phelps does not identify anything in what he was told that ties the behavior specifically to grooming rather than to conduct that simply made students uneasy.

Because a jury could find that Phelps's statements were not substantially true, whether the statements were false is a genuine issue of material fact, and summary judgment is inappropriate on this ground.

**b. Opinion**

Phelps next argues that he is entitled to summary judgment because his statements were opinions. (Phelps Motion, Doc. 63, Pg. ID 2583-86.)

Statements of opinion are protected speech under the Ohio Constitution. *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 184 (Ohio 1995). Whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. *Id.* To answer this question, a court must determine whether a reasonable reader or hearer would perceive the statement as a fact or opinion. *Id.* at 186. When determining whether speech is protected opinion, Ohio courts apply a totality-of-the-circumstances analysis and consider the following four factors: (1) the specific language at issue, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appeared. *Scott v. News-Herald*, 496 N.E.2d 699, 705 (Ohio 1986). On review, the factors favor viewing Phelps's statements as fact.

**i. The Language at Issue**

"The assessment of the totality of the circumstances begins with an analysis of the common usage or meaning of the allegedly defamatory words themselves to determine

whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications." *Hartman v. Kerch*, 217 N.E.3d 881, 898 (Ohio Ct. App. 2023) (cleaned up). "A classic example of a statement with a well-defined meaning is an accusation of a crime whereas statements that are loosely definable or variously interpretable cannot in most contexts support an action for defamation." *Id.* (cleaned up).

*Hartman v. Kerch* is on point. 217 N.E.3d at 898-99. In *Hartman*, the Eighth District Court of Appeals of Ohio held that a statement accusing the plaintiffs of "prey[ing] on older single women" was unambiguous. *Id.* The court reasoned that "the common usage or meaning of the word 'prey,' implie[d] that [the plaintiffs] were victimizing older single women for their own benefit." *Id.* at 899. "Indeed, definitions of the verb 'prey' include 'to commit violence or robbery or fraud,' 'to have an injurious, destructive, or wasting effect,' and 'to victimize another or others.'" *Id.* "Like 'racist' and 'con artist,' the term's implications are unambiguous, precise, and plainly pejorative." *Id.* As in *Hartman*, Phelps's statements that Erikson "preyed on young women," and later confirming that others had made similar allegations, weigh in favor of actionability.

**ii. Verifiability**

"The next totality-of-the-circumstances factor seeks to determine whether the allegedly defamatory statements are objectively capable of proof or disproof because a reader cannot rationally view an unverifiable statement as conveying actual facts." *Hartman*, 217 N.E.3d at 899. "If the publication implies that the defendant has first-hand knowledge that substantiates the opinions he asserts, it is more likely that the statement is one of fact and not opinion." *Id.* (cleaned up).

*Hartman* is again directly on point. There, the Eighth District held that an accusation that the plaintiffs "preyed" on community members was objectively verifiable because residents were "capable of confirming or denying" whether those acts occurred. *Hartman*, 217 N.E.3d at 899. Applied here, Phelps's statement that Erikson "preyed on other young women," coupled with his assertion that several individuals had already come forward, demonstrates verifiable acts. Because these allegations can be confirmed or refuted by the alleged individuals involved, Phelps's statements are objectively verifiable and weigh heavily in favor of actionability.

**iii. The General Context**

Next, the Court considers the "first 'contextual' assessment of the totality-of-the-circumstances inquiry, which seeks to consider the 'immediate context' in which the allegedly defamatory statement appears." *Hartman*, 217 N.E.3d at 899. Under this factor, the Court examines "more than simply the alleged defamatory statements in isolation." *Id.* (quoting *Wampler v. Higgins*, 752 N.E.2d 962, 980 (Ohio 2001)). Instead, it evaluates the entire communication because "unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content." *Id.*

Here, the immediate context reinforces that Phelps's statements were factual rather than opinion. Phelps made his comments during a text exchange about a rape disclosure, wherein he also urged Witt to report the situation to protect other women. (Phelps Text Message, Doc. 52-1, Pg. ID 1879.) Given that these statements were made during a serious discussion about addressing alleged sexual misconduct, a reasonable

reader would understand them as factual assertions rather than personal opinion. The immediate context factor thus weighs in favor of actionability.

**iv. The Broader Context**

Finally, the Court considers "the allegedly defamatory statement in the broader social context into which the statement fits." *Hartman*, 217 N.E.3d at 901 (cleaned up). This factor considers whether the medium or genre of communication customarily signals to an average reader that the statement is opinion rather than fact. *Id.* Here, the social context of text messaging does not decisively favor either party. While text messaging is often an informal medium used for casual conversation and personal opinions, individuals also routinely use texts to convey direct, factual information. Because the medium itself does not inherently signal pure opinion or verified fact, this factor is neutral.

In sum, evaluating the totality of the circumstances shows that the relevant factors weigh heavily in favor of treating Phelps's statements as fact rather than opinion. Phelps is therefore not entitled to summary judgment on this basis.

**c. Qualified Privilege**

Phelps lastly argues that his statements are protected under qualified privilege. (Phelps Motion, Doc. 63, Pg. ID 2583-86.) Qualified privilege is recognized as a defense to defamation. *See M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209 (Ohio 1994).

A statement is subject to qualified privilege "when it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." *Hahn v. Kotten*, 331 N.E.2d

713, 718 (Ohio 1975). Put another way, the elements of qualified privilege "are fully satisfied by showing that the relationship of the parties to the communication is such as to afford a reasonable ground for supposing an innocent motive for giving information and to deprive the act of an appearance of officious intermeddling in the affairs of others." *McCartney v. Oblates of St. Francis de Sales*, 609 N.E.2d 216, 224 (Ohio Ct. App. 1992).

Qualified privilege "can be defeated only by a clear and convincing showing that the communication was made with actual malice. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1292 (Ohio 1995). In this context, "'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank*, 573 N.E.2d 609, 614 (Ohio 1991).

Qualified privilege does not present a complete defense on this record. Phelps provides no evidence that he had any formal reporting obligations at Xavier. Instead, he testified only that he had, in the past, directed students who confided in him toward formal reporting mechanisms. (Phelps Dep., Doc. 52-1, Pg. ID 2000.) In that same vein, Witt testified to confiding in Phelps as a mentor, and did not indicate that Witt came to him in any official reporting capacity. (Witt Dep., Doc. 46-1, Pg. ID 1014.) Whether Phelps's statements to Witt were nonetheless "fairly made" in discharge of some moral duty, for example, a duty to a former student, or an interest in campus safety, is a question this record does not resolve as a matter of law. Because genuine issues of material fact exist as to the applicability of qualified privilege, summary judgment is inappropriate.

Phelps thus fails to demonstrate that he is entitled to summary judgment on Erikson's defamation claim against him.

**IX. Erikson's Defamation Claim against Witt**

Erikson next brings a claim against Witt for defamation. (Compl., Doc. 1, ¶¶ 24-26.) Erikson's defamation claim against Witt generally relates to Witt's accusations of rape against Erikson, both made during the HCAP proceeding and to Phelps. (*See id.*) Witt argues that summary judgment is warranted on this claim because Witt's statements are truthful, protected opinion, and protected both by absolute and qualified privilege. (*See* Witt Motion, Doc. 65.) The Court need not consider the truthfulness of Witt's statements or whether they constitute opinion, as they are privileged and therefore immune from liability.

Witt's statements made during the HCAP proceedings are protected by absolute privilege. "A statement which is afforded absolute privilege is completely protected" from a defamation claim. *Burkes v. Stidham*, 668 N.E.2d 982, 987 (Ohio Ct. App. 1995). "The defense of absolute privilege is generally limited to legislative and judicial proceedings, and other acts of state." *Id.* (citation omitted). But, Ohio courts have extended absolute privilege to statements made in quasi-judicial proceedings. *See Doe v. Univ. of Dayton*, 2018 U.S. Dist. LEXIS 45047, at *11-12 (S.D. Ohio Mar. 20, 2018) (citing Ohio law). And, "Ohio treats university disciplinary hearings that provide students with notice, a hearing, and the opportunity to present evidence as quasi-judicial proceedings, and statements in connection with such proceedings are accorded absolute privilege." *Id.*

The HCAP proceeding provided notice, a hearing, and an opportunity to present

evidence, qualifying it as a quasi-judicial proceeding. (*See* Erikson Dep., Doc. 49-1, Pg. ID 1465-68.) Witt's statements made during the HCAP investigation and disciplinary hearing are thus protected by absolute privilege. *Doe v. Univ. of Dayton*, 766 F. App'x 275, 290 (6th Cir. 2019); *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 435-36 & n.3 (Ohio Ct. App. 2014) (affording absolute privilege to statements made in the context of university disciplinary proceedings).

Qualified privilege also protects the initial statements that Witt made to Phelps before the formal HCAP proceedings. Courts recognize that qualified privilege extends to a speaker discussing an alleged sexual assault with close friends and university authorities. *Doe*, 766 F. App'x at 290. As the Sixth Circuit has observed:

> We do not lightly apply a framework commonly applied to public statements about third parties in this most personal of contexts: a conversation with intimates about your own possible sexual assault. Nor do we disregard the risk that victims of sexual assault could be dissuaded from sharing their experiences—and so from seeking support, justice, and treatment—by looming defamation suits.

*Id.*; *see also Doe*, 2018 U.S. Dist. LEXIS 45047, at *14 (noting the "objectionable policy implications" of forcing victims to weigh seeking help against the threat of civil defamation liability.).

Because qualified privilege protects Witt's extrajudicial statements, the burden shifts to Erikson to establish by clear and convincing evidence that Witt acted with actual malice to overcome that privilege. *A & B-Abell*, 651 N.E.2d at 1292. That is, that Witt published the statements with knowledge of their falsity or with reckless disregard for their truth. *See id.* Reckless disregard is defined as publishing statements with a "high

degree of awareness of [their] probable falsity" or when the publisher "in fact entertained serious doubts as to the truth of [the] publication." *Varanese v. Gall*, 518 N.E.2d 1177, 1179 (Ohio 1988). Further, "[i]t is not sufficient for a libel plaintiff to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity." *Jacobs*, 573 N.E.2d at 616 (quotation omitted).

Erikson has not met this high evidentiary threshold. In fact, Erikson does not present any argument relating to actual malice in his briefing. (*See* Response, Doc. 79, Pg. ID 3527.) To be sure, the record contains no evidence that Witt doubted the truth of the account when confiding in Phelps. Indeed, the only evidence that Erikson could rely on would be his denial of the assault. But conflicting accounts alone do not establish actual malice. In fact, "where evidence conflicts and is subject to differing reasonable interpretations, such a dispute supports, rather than precludes, summary judgment for defendants in a public official defamation case." *Burns v. Rice*, 813 N.E.2d 25, 36 (Ohio Ct. App. 2004) (citation omitted). Without more, Erikson cannot overcome the qualified privilege that protects Witt's statements.

Witt's statements are therefore privileged, and summary judgment must be entered in Witt's favor on Erikson's defamation claim against Witt.

## II. Claims Against Xavier

The Court now turns to Erikson's claims against Xavier. As noted above, Erikson brings a breach of contract claim, claims for violations of Title VII and Title IX, and a claim for public disclosure of private facts against Xavier. (Compl., Doc. 1, ¶¶ 30-42.) Because these claims ultimately relate to Xavier's enforcement of university policies, they must be

reviewed under an abuse of discretion standard as applied to Xavier's actions. *See Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (applying Ohio law to find that "[c]ourts [] will not interfere with a private university's right to make regulations, establish requirements, set scholastic standards, and enforce disciplinary rules absent a clear abuse of discretion"). The Court will consider each claim in turn.

**a. Breach of Contract Claim Against Xavier**

The Court will first consider Erikson's breach of contract claim. (*See* Compl., Doc. 1, ¶¶ 37-39.) To prove a breach of contract under Ohio law, a plaintiff must prove four elements: (1) that a contract existed; (2) the plaintiff performed; (3) the defendant breached; and (4) the plaintiff suffered damages as a result of the breach. *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (applying Ohio law).

Erikson argues that he is entitled to summary judgment because Xavier breached his employment contract—which he contends incorporates the HCAP—in three ways: (1) allowing Witt's untimely complaint to proceed, (2) processing Witt's complaint as a formal charge, and (3) launching a formal investigation into a non-student's complaint regarding off-campus activity. (*See* Erikson Motion, Doc. 64.) In response, Xavier argues that it is entitled to summary judgment because the HCAP is not part of Erikson's employment contract, and even if it were, Xavier did not breach it. (Xavier Motion, Doc. 67.) The Court addresses each argument in turn.

**i. The HCAP as a Part of the Employment Contract**

The Court must first determine whether the HCAP forms a part of Erikson's employment contract with Xavier. The primary evidence provided by the parties relating

to Erikson's employment contract are two documents: the Salary Letter and the Increase-in-Salary Letter. (*See* Salary Letter, Doc. 49-1, Pg. ID 1615; Increase-in-Salary Letter, Doc. 49-1, Pg. ID 1616.) The Increase-in-Salary Letter merely notifies Erikson of a salary adjustment and details the mechanism used to calculate it. (*See* Increase-in-Salary Letter, Doc. 49-1, Pg. ID 1616.) The Salary Letter adds additional context, specifying that Erikson's appointment to associate professor is subject to the Faculty Handbook. (Salary Letter, Doc. 49-1, Pg. ID 1615.)

The Faculty Handbook provides more insight into Xavier's faculty standards, such as promotion and termination requirements. (Faculty Handbook, Doc. 43-1, Pg. ID 404-39.) But it also references external "University policies," without detailing their terms. (*Id.* at Pg. ID 433, 437.) This lack of detail as to contractual terms is not uncommon in higher education and, as a result, under Ohio law, where faculty standards are "established by various policies, rules and regulations adopted by [the university] and promulgated to its faculty," those rules "become a part of the employment contract as a matter of law." *Rehor v. Case Western Reserve Univ.*, 331 N.E.2d 416, 420 (Ohio 1975).

This principle aligns with settled contract law that explicit contractual terms may be supplemented by implied agreements derived from "'the promisor's words and conduct in the light of the surrounding circumstances.'" *Perry v. Sindermann*, 408 U.S. 593, 602 (1972) (quoting 3 A. Corbin on Contracts §§ 561-572A (1960)). The meaning of those words and acts is guided by past usage. *Id.* Here, the record contains testimony from both parties that Xavier employees were required to comply with university policies—including the HCAP—as a condition of continued employment. (Erikson Dep., Doc. 49-

1, Pg. ID 1394-95; Lawson Dep., Doc. 43-1, Pg. ID 659; Hanycz Dep., Doc. 47-1, Pg. ID 1181.) This shared understanding supports Erikson's argument that the HCAP was incorporated into his employment agreement. *See Perry*, 408 U.S. at 603 (noting that rules promulgated by an institution may justify a legitimate claim for continued employment).

Xavier responds by arguing that, because it retained the authority to unilaterally modify these policies, the HCAP cannot constitute part of Erikson's employment contract. (Xavier Response, Doc. 77, Pg. ID 3509.) But, a reservation of rights to amend a policy does not prevent that policy from forming part of the agreement. Under Ohio law, modifying a faculty member's employment contract requires mutual assent and consideration. *Rehor*, 331 N.E.2d at 420–21. In *Rehor*, the Supreme Court of Ohio held that a tenured professor agreed to a modified retirement policy where the board of trustees had explicitly reserved the right to alter those rules in its bylaws, and the professor subsequently signed annual reappointment letters that provided salary increases. *Id.* Executing those letters, alongside the salary adjustments, supplied the necessary mutual written assent and consideration to modify the underlying contract. *Id.* Xavier's ability to modify its policies therefore does not inherently prevent the HCAP from being part of the employment contract.

The record thus contains a genuine factual dispute over whether the HCAP was incorporated into Erikson's employment contract through the parties' mutual understandings.

**ii. Alleged Breaches of the HCAP**

Assuming that the HCAP is a part of Erikson's employment contract with Xavier,

the Court now considers whether any of Xavier's conduct constituted a breach.

Erikson points to three procedural departures during the HCAP process: (1) granting an untimely extension; (2) proceeding under formal charges; and (3) asserting jurisdiction over off-campus conduct involving a non-student. (Erikson Motion, Doc. 64, Pg. ID 2592-96.) While one breach in isolation might not definitively establish an abuse of discretion, when these breaches are considered together, a reasonable jury could find that Xavier exercised its discretion arbitrarily.

**A. Extension to Witt's Complaint**

Erikson first argues that Xavier breached the HCAP by allowing Witt's untimely complaint to proceed. (Erikson Motion, Doc. 64, Pg. ID 2594-95.) The HCAP establishes a general two-year time limitation for filing complaints, subject to "reasonable extension[s]." (HCAP, Doc. 1-4, Pg. ID 112.) "Reasonable time is not measured by hours, days, weeks, months or years, but is derived from the surrounding conditions and circumstances which the parties had in contemplation upon execution of the contract." *Turner Brooks of Ohio, Inc. v. Bowling Green State Univ.*, 554 N.E.2d 956, 959 (Ohio Ct. Claims 1989) (citation omitted).

Whether Xavier breached the HCAP through its extension is not entirely clear. On one hand, Witt's complaint was delayed by only five weeks past the two-year reporting window, which Xavier argues was a minor, reasonable delay. (Xavier's Response, Doc. 77, Pg. ID 3515.) On the other hand, Xavier acknowledges that granting such an extension past the two-year deadline was unprecedented in its administration of the HCAP. (Lawson Dep., Doc. 43-1, Pg. ID 914.)

The stated reasoning behind the deadline reinforces the notion that the extension may have been inappropriate. The two-year limitation protects parties from responding to older complaints where the passage of time can result in faded witness memories. (HCAP, Doc. 1-4, Pg. ID 112-13.) That protection is particularly important here, as the case relies almost entirely on conflicting testimony. Standing alone, a five-week extension might not constitute an abuse of discretion as a matter of law. But, given that Xavier had never granted such an extension before, and that the delay risked altering witness memories, this extension contributes to a larger factual question regarding whether Xavier exercised its discretion arbitrarily.

**B. Processing as a Formal Charge**

Erikson next argues that, because Witt filed the HCAP complaint late, Xavier could not process it as a formal complaint. (Erikson Motion, Doc. 64, Pg. ID 2595-96.) Under the HCAP, a complaint filed after the two-year deadline cannot go through formal procedures, though informal options remain open at any time. (HCAP, Doc. 1-4, Pg. ID 113.) Xavier counters that Section 5.8 of the HCAP also states that allegations of rape or sexual assault automatically bypass informal resolution and proceed directly to a formal hearing. (*See* HCAP, Doc. 1-4, Pg. ID 114.) Xavier reads this section to mean that sexual assault complaints, like Witt's, must always go to a formal hearing. (Xavier Response, Doc. 77, Pg. ID 3517.)

While Xavier's reading is one plausible interpretation, there is another equally plausible read of the HCAP: the two-year deadline acts as a gatekeeper that limits late complaints to informal procedures, while Section 5.8 simply decides the track for

complaints that were filed on time. Under this view, Section 5.8 does not erase the two-year deadline.

Because both readings are reasonable, the policy is ambiguous. But, even if forcing an untimely complaint into a formal process were defensible on its own under Xavier's reading, pairing this ambiguity with an unprecedented deadline further emphasizes the factual issue as to whether Xavier abused its discretion in formally proceeding with Witt's complaint.

### C. Non-Student and Off-Campus Activity

Finally, Erikson argues that Xavier breached the HCAP by processing a complaint brought by a non-student concerning alleged conduct that occurred off campus. (Erikson Motion, Doc. 64, Pg. ID 2592-93.) In response, Xavier points to language in the HCAP which states that "third parties" may bring complaints against Xavier employees, as well as the language in Section 4.2.2 defining Interpersonal Violence broadly as acts "perpetrated by any person against another." (Xavier Response, Doc. 77, Pg. ID 3518; HCAP, Doc. 1-4, Pg. ID 69.) Xavier also relies on Section 4.2.2's note that Interpersonal Violence addresses conduct outside Title IX, "such as, but not limited to, conduct of a student that occurs off campus." (Xavier Response, Doc. 77, Pg. ID 3518; HCAP, Doc. 1-4, Pg. ID 69.)

To be sure, the policy text suggests that third parties generally can bring complaints under the HCAP. Section 1.2 explicitly permits a "third party" to file a complaint, and Section 2.1 encourages third parties to report incidents to the University's Title IX office. (HCAP, Doc. 1-4, Pg. ID 50-52.) But whether that authority extends to off-

campus activity is less clear.

Section 1.2 of the HCAP specifically qualifies its definition of a third party as "i.e. visitor to campus." (HCAP, Doc. 1-4, Pg. ID 51.) "The term 'i.e.' is an abbreviation for the Latin phrase *id est* and means 'that is.'" *Pack v. Pack*, 2021 Ohio App. LEXIS 2189, at *12-13 (Ohio Ct. App. 2021) (citation omitted). "The term 'i.e.' is used when a term is meant to be interchangeable with or definitional of an affected term, rather than just a possible example." *Id.* at *13 (quotation omitted). "When used properly, it indicates an exhaustive list." *Id.* Thus, while the section indicates that third parties are allowed to file complaints, it restricts that definition to people visiting the campus itself.

The HCAP explicitly addresses off-campus activity in only two places, and both similarly limit Xavier's reach. Section 1.2 limits the general reach of the policy to "University Community members" while they are "on campus or are participating in a University-related off-campus activity." (HCAP, Doc. 1-4, Pg. ID 50.) The only other reference appears in Section 4.2.2, which extends coverage beyond Title IX to include "conduct of a student that occurs off-campus." (*Id.* at Pg. ID 69.) Read together, these provisions show that off-campus conduct is covered only when it involves a school-sponsored event or actions committed by a student. Xavier identifies no HCAP language extending off-campus jurisdiction to alleged conduct by an employee against a non-student outside a University function.

Because Witt was not a student, was not a visitor on campus, and the alleged event happened off campus at a non-university function, applying the policy here likely stretches its terms beyond what the text allows. While witness testimony notes that

Xavier has historically investigated complaints involving third parties, that testimony does not clarify whether the relevant conduct in those prior incidents occurred on or off campus. (Lawson Dep., Doc. 43-1, Pg. ID 655-56; Cull Dep., Doc. 45-1, Pg. ID 946-47; Hanycz Dep., Doc. 47-1, Pg. ID 1186.) Without evidence that Xavier has ever applied this policy to off-campus conduct involving non-students, selecting to process Witt's complaint creates a genuine issue of material fact. A reasonable jury could find that forcing Erikson into a formal proceeding under these circumstances went beyond the University's authority and constituted an abuse of discretion, making summary judgment improper.

In sum, a genuine issue of material fact exists regarding whether the HCAP was incorporated into Erikson's employment contract. If the HCAP was incorporated, Xavier may have abused its discretion in pursuing Witt's complaint. Taking Xavier's actions together—granting an unprecedented deadline extension, resolving policy ambiguity in favor of a formal charge, and expanding jurisdiction to off-campus conduct with a non-student—a reasonable jury could conclude that Xavier abused its discretion. Consequently, neither party is entitled to summary judgment on Erikson's breach of contract claim.

**b. Title VII Claim Against Xavier**

The Court next considers Erikson's gender discrimination claim against Xavier under Title VII. (Compl., Doc. 1, ¶¶ 30-33.) Title VII prohibits employers from discriminating against their employees on the basis of sex. *See* 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A).

Where, as here, a plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Court applies the *McDonnell Douglas* burden-shifting framework. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). The first step of this framework requires a plaintiff to establish a prima facie case for discrimination. *Id.* at 363. To establish a prima facie case for sex discrimination, a plaintiff must show that he was: (1) a member of a protected class, (2) qualified for the position, (3) the victim of an adverse employment action, and (4) replaced by someone outside the protected class. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991).

Once the plaintiff establishes his prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Ang*, 932 F.2d at 548; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reason was but a pretext for unlawful discrimination. *Id.*; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Court proceeds on the assumption that Erikson has proven his prima facie case. Xavier too satisfies its burden of showing that it terminated Erikson for a legitimate, nondiscriminatory reason: the HCAP finding constituted "grave cause" warranting termination, as defined by the Faculty Handbook. (*See* Xavier Motion, Doc. 67, Pg. ID 2706.) An employee's violation of an employer's established policy can constitute a legitimate, nondiscriminatory reason for termination. *Adamov v. United States Bank Nat'l Ass'n*, 726 F.3d 851, 854-55 (6th Cir. 2013) (citation omitted). The burden thus shifts back to Erikson to show that this reason is pretextual.

The fundamental question in the pretext analysis is: did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-CV-656, 2010 U.S. Dist. LEXIS 34406, at *7 (S.D. Ohio Apr. 7, 2010). A plaintiff may refute an employer's proffered legitimate reason by showing that the reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Erikson presents no argument to demonstrate pretext. (Erikson Response, Doc. 75, Pg. ID 3489.) And, although the underlying HCAP decision by Xavier may not have complied with its policy procedure, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) (citation omitted). Erikson has thus failed to overcome his burden to show that Xavier's proffered reason for terminating him was pretextual. Summary judgment must therefore be entered in favor of Xavier on Erikson's Title VII claim.

**c. Title IX Claim Against Xavier**

The Court now considers Erikson's Title IX gender discrimination claim. (Compl., Doc. 1, ¶¶ 30-33.) As an initial matter, Xavier again argues in its Motion for Summary Judgment that Title IX preempts Title VII. (Xavier Motion, Doc. 67, Pg. ID 2718-19.) The Court previously rejected this argument, holding that Title IX does not preempt Title VII

claims. (Order on Motions to Dismiss, Doc. 18, Pg. ID 264-65.) Because Xavier points to no new authority or factual developments that would justify departing from that prior holding, the Court declines to reconsider its decision and adheres to its earlier ruling. *See Kilnapp v. City of Cleveland*, 167 F.4th 909, 917-18 (6th Cir. 2026) (citation omitted) ("[W]hen the same issue is presented in the same case to the same court, the same result should follow.").

Turning to the substance of the claim, Title IX, in part, provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A litigant may dispute a university disciplinary proceeding on gender bias grounds under four theories: erroneous outcome, selective enforcement, deliberate indifference, or archaic assumptions. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citations omitted).

Erikson pursues his claim under an "erroneous outcome" theory, alleging that Xavier reached an inaccurate finding of responsibility because of his gender. (Compl., Doc. 1, ¶ 32.) "The gravamen of an erroneous outcome claim is that an 'innocent' person was wrongly found to have committed an offense because of his or her gender." *See Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 7254213, at *5 (S.D. Ohio Nov. 17, 2015). To establish liability under this theory, Erikson must offer evidence to "(1) cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a particularized causal connection between the flawed outcome and gender bias." *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018).

Even assuming that Erikson satisfies the first prong by pointing to the procedural issues surrounding the HCAP discussed above, his claim fails under the second prong because he presents no evidence that gender bias drove that outcome. Erikson cannot rely on procedural errors alone or conclusory allegations of bias to demonstrate causation; he must produce actual evidence showing that gender-based animus motivated Xavier's decision. *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (quotation omitted). Such causation can be shown by "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* Statistical evidence of a university's pattern of gender-based decision-making, combined with specific external pressures placed on the university to handle sexual assault cases aggressively, can also support a reasonable inference of gender discrimination. *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018). Erikson fails to make such a showing.

First, Erikson argues that negative characterizations of him in the investigative notes show bias. (Erikson Response, Doc. 75, Pg. ID 3490.) But, the record indicates that these notes compiled the evidence gathered during Lawson's investigation, which Erikson was permitted to review, oppose, and prepare to rebut prior to the hearing. (Notice of Formal Complaint, Doc. 43-1, Pg. ID 602-03; Lawson Dep., Doc. 43-1, Pg. ID 735.) Erikson identifies no specific portion of Lawson's notes that explicitly demonstrated a gender-based animus. (*See* Erikson Response, Doc. 75, Pg. ID 3490.) Instead, Lawson's notes simply reflect the factual allegations she accumulated during her investigation. (Interpersonal Violence Investigation Report, Doc. 43-1, Pg. ID 565-66.)

Erikson's remaining arguments similarly fail to demonstrate gender bias. He first points to Witt's allegations of "grooming" and the panel's general finding that an "imbalance of power" and alcohol consumption impacted consent to demonstrate bias. (Erikson's Response, Doc. 75, Pg. ID 3491-93.) But, power dynamics, alcohol, and grooming behaviors are not inherently gender-specific, as they may apply regardless of gender. Further, while Dramis testified about the imbalance of power being based partly on Erikson's status as a male, she was not a decisionmaker on the panel, and, without more, her remarks do not reflect the panel's reasoning. (*Id.* at Pg. ID 3492-93; Dramis Dep., Doc. 44-1, Pg. ID 867.) Finally, Erikson argues that the panel's use of Witt's preferred pronouns demonstrates bias, but he presents no evidence connecting this procedural choice to an animus against men. The application of these measures to Erikson, who is a male, does not, without more, demonstrate gender discrimination. *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)

At best, Erikson's evidence points to a potential bias against individuals accused of sexual misconduct, which does not amount to unlawful gender bias under Title IX. *See Sahm*, 110 F. Supp. 3d at 778 ("[T]hese facts pleaded against [the defendant] do not suggest a gender bias against males so much as against students accused of sexual assault."). Because Erikson fails to produce evidence creating a genuine dispute of material fact as to causation, Xavier is entitled to summary judgment on his Title IX claim.

**d. Public Disclosure of Private Facts Claim Against Xavier**

Lastly, the Court will consider Erikson's public disclosure of private facts claim against Xavier. (Compl., Doc. 1, ¶¶ 40-42.) Xavier moves for summary judgment on this

claim, which Erikson does not oppose and explicitly abandons in his response. (Xavier Motion, Doc. 67, Pg. ID 2699-704; Erikson Response, Doc. 75, Pg. ID 3496.) Summary judgment in favor of Xavier is therefore appropriate on this claim. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

## CONCLUSION

Based on the foregoing, the Court **ORDERS** the following:

1. Defendant Kelly Phelps's Motion for Summary Judgment (Doc. 63) is **DENIED**;
2. Plaintiff Bruce Erikson's Motion for Partial Summary Judgment (Doc. 64) is **DENIED**;
3. Defendant Eva Marie Witt's Motion for Summary Judgment (Doc. 65) is **GRANTED**;
4. Defendant Xavier University's Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART AND DENIED IN PART**;
5. Summary judgment is **ENTERED** in favor of Defendant Eva Marie Witt on Plaintiff Bruce Erikson's defamation claim against Witt;
6. Summary judgment is **ENTERED** in favor of Defendant Xavier University on Plaintiff Bruce Erikson's Title VII and Title IX claims against it; and
7. Plaintiff Bruce Erikson's defamation claim against Defendant Kelly Phelps and his breach of contract claim against Defendant Xavier University **SHALL PROCEED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: Matthew W. McFarland
JUDGE MATTHEW W. McFARLAND